[Cite as *In re H.C.*, 2015-Ohio-3545.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: H.C. | : | **O P I N I O N** |
| | : | |
| | | **CASE NO. 2014-P-0059** |
| | : | |

Appeal from the Portage County Court of Common Pleas, Juvenile Division.
Case No. 2014 JCC 00349.

Judgment: Affirmed in part, reversed in part, and remanded.

*Denise E. Ferguson*, P.O. Box 26004, Akron, OH 44319 (For Appellant Kessleen J. Baker).

*Victor V. Vigluicci*, Portage County Prosecutor, and *Raymond H. Srp*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Appellee Portage County Department of Job and Family Services).

TIMOTHY P. CANNON, P.J.

{¶1} Appellant, Kessleen J. Baker, appeals the judgment of the Portage County Court of Common Pleas, Juvenile Division, finding her minor child, H.C., to be neglected. The issues on appeal are whether the juvenile court erred in denying appellant's motion to dismiss; whether the finding of neglect was against the manifest weight of the evidence; and whether the juvenile court complied with R.C. 2151.419 in support of its determination that reasonable efforts were made to prevent H.C.'s

removal. For the following reasons, we affirm in part and reverse and remand in part the decision of the juvenile court.

{¶2} On April 30, 2014, appellee, Portage County Department of Job and Family Services ("PCDJFS"), filed a complaint, alleging that appellant's son, H.C., was neglected, pursuant to R.C. 2151.03(A), and dependent, pursuant to R.C. 2151.04(C). The complaint included the following allegations:

> [PCDJFS] received a report regarding H.C. (DOB: 09/30/1999), son of Kessleen Baker, on 04/29/2014. It was reported H.C. had made comments about killing himself. He was said to have cut himself 04/28/2014 and 04/29/2014 and says he wants to kill himself. H.C. also wrote a suicide note on 04/25/2014 in which he was specific regarding the method, date and time of the planned suicide.
>
> Kessleen Baker was contacted and advised of H.C.'s comments and actions and advised to take H.C. to the hospital to seek treatment for him. She stated it was not the first time this has occurred, therefore she was not concerned. Kessleen refused to pick up H.C. from school or take him for treatment. * * *
>
> H.C. reports that he did have one appointment with a mental health professional and was diagnosed with major depressive disorder. Additional appointments were made, but H.C. reports his mother refuses to take him to the appointments. * * *
>
> Officer Brian Carnahan of the Kent Police Department ordered the removal of H.C. from Kessleen's care upon her refusal to take H.C. for treatment. After being evaluated at Coleman [Access], H.C. was transported to Belmont Pines Hospital. * * * PCDJFS is requesting Temporary Custody of H.C. to link the child with services that will ensure his physical and emotional safety.

{¶3} A shelter care hearing was held on April 30, 2014, and a magistrate's order was filed on May 2, 2014, which awarded interim pre-dispositional custody of H.C. to PCDJFS. On June 26, 2014, an adjudicatory hearing was held before a magistrate, at which the following persons testified.

2

{¶4} Jason Goshe, H.C.'s school counselor, testified that on April 29, 2014, during school hours, a student came to the counselor's office upset that her mother had found a suicide note written by H.C. The student's mother brought the note to the school, which Mr. Goshe read over. Mr. Goshe contacted appellant, who was concerned that it had come from another student and stated Mr. Goshe should talk directly to H.C. about the note. As he left his office to find H.C., a teacher was entering Mr. Goshe's office with other concerns about H.C. Mr. Goshe testified that when H.C. was then brought to his office, he seemed down and like he was having a hard day. Mr. Goshe administered a suicide risk screening assessment, on which H.C. scored a 44, "significantly higher" than the baseline score of 25. Mr. Goshe called appellant again, explained to her the details of the situation, and stated H.C. needed picked up from the school and required further evaluation by a mental health professional. Mr. Goshe testified that appellant responded she was not going to pick up H.C. from school, and she would not permit any of H.C.'s other emergency contacts to pick him up. Appellant, instead, repeatedly instructed Mr. Goshe to "call the State." After unsuccessfully attempting to contact H.C.'s step-father, Mr. Goshe eventually contacted PCDJFS.

{¶5} Jeremy Garver-Hughes, H.C.'s homeroom teacher, also testified. He stated that on April 29, 2014, he observed H.C. in his homeroom class with his head down. He approached H.C. regarding make-up assignments, as he had missed a couple days of school the previous week, and H.C. stood up and left the classroom. Mr. Garver-Hughes testified that he sent a student to look for H.C., who found him in a nearby room. Mr. Garver-Hughes was called to the room, where he found H.C. "digging

3

in his wrists with a paper clip." He had H.C. hand him the paper clip and then went to find Mr. Goshe.

{¶6} Officer Mike Carnahan, with the Kent Police Department, also testified on behalf of PCDJFS. Officer Carnahan testified that upon responding to the school, he and two other officers found H.C. lying in a fetal position on the floor of the office. H.C. told the officer that he wanted to kill himself; he had cut his wrists the night before; he cut his wrists with a paper clip that day; and he wrote the suicide note. Officer Carnahan testified that he attempted to contact appellant three times at work and three times on her cell phone and left a voicemail to call the police department, but appellant did not respond. He testified that after another officer made contact with appellant at work, appellant again refused to address H.C.'s immediate mental health concerns, and Officer Carnahan ordered H.C.'s removal.

{¶7} Andrea Sharar, a social service worker with PCDJFS, testified that she arrived at the school after the police ordered H.C.'s removal. She testified that H.C. expressed to her that he wanted to kill himself. Ms. Sharar stated she contacted appellant regarding H.C.'s removal and that appellant responded: "It's not that big of a deal"; angrily stated Ms. Sharar "had sent her son to a facility with rapists"; and threatened to sue Ms. Sharar and PCDJFS. Ms. Sharar further testified that PCDJFS had been unable to locate any current relatives appropriate for H.C.'s temporary placement.

{¶8} Appellant was the only witness to testify in her behalf. She testified that she did not refuse to pick up H.C. from school, but that she was having trouble leaving work. She stated she had just missed three days of work for a funeral, and during the

4

time the school and police were trying to reach her, she was telling her co-workers that she would have to take an early lunch. She testified that the police had hung up on her, and that when she called dispatch, she was informed H.C. was already en route to Coleman Professional Services. She stated that when she contacted Coleman, they told her not to show up there.

{¶9} Appellant testified that she had been providing mental health treatment to H.C. since February 2011 and outlined the various doctors and treatment facilities she had taken him to over the past three years. She testified that H.C. had an appointment scheduled with a mental health professional for April 30, 2014, the day after H.C. was removed from school, and that this appointment had been rescheduled multiple times for various reasons. Appellant testified that H.C. oftentimes refused to attend his appointments, but that she has never refused him treatment. On direct examination, appellant confirmed that H.C. had been admitted previously to a Partial Hospital Program at Akron Children's Hospital for "a concern from the school [that he] had suicidal ideation"; on cross, she denied that H.C. ever had issues with suicide or suicidal ideation. Finally, she denied that she told Mr. Goshe to "call the State."

{¶10} On July 3, 2014, a magistrate's decision was issued, finding H.C. to be a neglected child but insufficient evidence to find him dependent. The magistrate made the following findings: "School counselor contacted mother regarding [H.C.'s] immediate need for mental health counseling to address suicidal ideations. Mother advised counselor she was not coming to get child and counselor should contact the State. [H.C.] has received inpatient treatment on 3 prior occasions since December 11, 2012."

5

**{¶11}** A dispositional hearing was scheduled for July 24, 2014, which was within the 90-day period from the filing of the April 30, 2014 complaint. However, on July 15, 2014, appellant filed objections to the magistrate's decision concerning the adjudication of neglect. The juvenile court then sua sponte continued the dispositional hearing and scheduled a hearing on the objections for August 25, 2014.

**{¶12}** On August 12, 2014, appellant filed a motion to dismiss the case, claiming the juvenile court lost jurisdiction, pursuant to R.C. 2151.35(B)(1), when it failed to hold the dispositional hearing within 90 days from the date the complaint was filed (i.e., by July 30, 2014). This matter was also scheduled for hearing on August 25, 2014. With leave of court, appellant filed supplemental objections to the magistrate's decision on August 25, 2014, prior to the hearing. Specifically, appellant argued the finding of neglect was against the manifest weight of the evidence and that the magistrate did not make a proper written determination regarding any reasonable efforts made to prevent H.C.'s removal or to enable him to return home.

**{¶13}** The juvenile court denied both appellant's objections to the magistrate's decision and her motion to dismiss on September 8, 2014. The matter was set for a dispositional hearing on September 18, 2014.

**{¶14}** On September 29, 2014, a magistrate's decision was issued granting temporary custody of H.C. to PCDJFS. The juvenile court adopted the magistrate's decision on the same date and entered it as a matter of record.

**{¶15}** Appellant filed her notice of appeal the next day, assigning three assignments of error for our review. Appellant's first assignment of error states:

6

{¶16} "The Trial Court committed reversible error in denying Mother's motion to dismiss after losing jurisdiction when the court failed to hold a dispositional hearing within 90 days."

{¶17} Appellant asserts the trial court lost jurisdiction in this matter when it held the dispositional hearing more than 90 days after the date the complaint was filed, in violation of R.C. 2151.35(B)(1). Therefore, appellant argues, the trial court erred when it denied appellant's motion to dismiss. Appellee responds that appellant implicitly waived the 90-day time limit by assisting in the delay of the dispositional hearing, and therefore, the trial court properly denied the motion to dismiss. We review a trial court's decision regarding a motion to dismiss under R.C. 2151.35(B)(1) de novo. *In re D.W.*, 4th Dist. Athens No. 06CA42, 2007-Ohio-2552, ¶11.

{¶18} R.C. 2151.35(B)(1) states, in pertinent part:

> The dispositional hearing shall not be held more than ninety days after the date on which the complaint in the case was filed. If the dispositional hearing is not held within the period of time required by this division, the court, on its own motion or the motion of any party or the guardian ad litem of the child, shall dismiss the complaint without prejudice.

However, as explicitly held by this court and the majority of appellate districts, this 90-day time limit is not jurisdictional. *In re Matsko*, 11th Dist. Lake Nos. 2006-L-230 & 2006-L-231, 2007-Ohio-2060, ¶16; *In re Jones*, 9th Dist. Summit No. 20306, 2001 Ohio App. LEXIS 1947, *8 (May 2, 2001); *In re Kutzli*, 71 Ohio App.3d 843 (3d Dist.1991); *In re Bailey*, 6th Dist. Lucas No. L-96-363, 1998 Ohio App. LEXIS 1571, *5 (Apr. 17, 1998); *In re N.B.*, 12th Dist. Butler Nos. CA95-02-031, CA95-03-056 & CA95-06-017, 1996 Ohio App. LEXIS 1486 (Apr. 15, 1996); *In re Kimble*, 7th Dist. Harrison No. 99 517 CA, 2002-Ohio-2409, ¶21. "[A]lthough a court may sua sponte dismiss a case and

7

when so dismissing it must do so without prejudice, R.C. 2151.35(B)(1) is not self-executing. Hence, the parties can waive the time limits." *Kimble*, *supra*, ¶26.

**{¶19}** Waiver of the 90-day time limit can occur expressly or implicitly. Ohio courts have held that "'[a]n implicit waiver occurs when a party fails to move for dismissal when it becomes the party's right to do so, or when the party assists in the delay of the hearing.'" *In re J.J.*, 8th Dist. Cuyahoga No. 86276, 2007-Ohio-535, ¶23, quoting *In re A.P.*, 12th Dist. Butler No. 2005-10-425, 2006-Ohio-2717; *see also Kutzli*, *Kimble*, and *Bailey*, *supra*. An implicit waiver may also occur when a party files a motion to dismiss but subsequently fails to file a petition for an extraordinary writ when the motion to dismiss has been denied. *See In re Chapman*, 11th Dist. Ashtabula No. 97-A-0001, 1998 Ohio App. LEXIS 1537, *10 (Apr. 10, 1998). *See also Matsko*, *supra*, ¶16; *In re J.M.B.*, 4th Dist. Ross No. 07CA2978, 2008-Ohio-1285, ¶22-23; *In re Martin*, 8th Dist. Cuyahoga No. 78440, 2001 Ohio App. LEXIS 3396, *6-7 (Aug. 2, 2001) (all following *Chapman*).

**{¶20}** This court has noted that when a party seeks an immediate dispositional hearing, that relief is best effectuated by way of a peremptory writ, rather than reversal of an untimely disposition challenged by way of a direct appeal. *Chapman*, *supra*, *10, citing *In re Fusik*, 8th Dist. Cuyahoga No. 41569, 1980 Ohio App. LEXIS 12046 (June 12, 1980). To hold otherwise would frustrate the purpose of the Legislature, which is to avoid delay in reaching disposition of these time-sensitive cases. *See id.* at *8-9. Reversal at this time would require the complainant "to re-initiate the proceedings and the statutory time periods [would] begin to run anew." *Id.* at *9. If the trial court had granted the motion to dismiss in this case, it also would have resulted in a re-filing of the

8

complaint and a new 90-day window. This result would also frustrate the purpose of the Legislature.

{¶21} Here, the trial court had initially scheduled the dispositional hearing within the 90-day limitation, which was continued only because appellant filed objections to the magistrate's decision. It was certainly appellant's right to file objections to the magistrate's decision finding H.C. to be a neglected child. However, in order to comply with R.C. 2151.35(B)(1), the trial court would had to have held the dispositional hearing while the objections were still pending; this would be tantamount to issuing a sentence before finding a criminal defendant guilty. Appellant also filed supplemental objections on August 25, 2014. Pursuant to Juv.R. 40(D)(3), filing objections set in motion other time limitations that would necessarily place the date for disposition beyond the 90-day limit. The brief extension resulted in the trial court holding the dispositional hearing on September 18, 2014, only 50 days beyond the 90-day limit. Extending the 90-day limitation for a brief period to allow the trial court to comply with the time requirements for addressing objections is comparable to the provision of R.C. 2945.72(E), which extends the statutory speedy trial requirements for a period of time necessary for the court to address a defendant's pretrial motion.

{¶22} With regard to waiver, appellant did file a motion to dismiss for untimeliness, but did not file a petition for an extraordinary writ. Although this failure could constitute an implicit waiver of a trial court's non-compliance with the statute, we find here that the trial court was not in violation of the statutory requirement. The trial court complied with the statute by scheduling a timely dispositional hearing. We hold that continuing that hearing for a reasonable amount of time to address appellant's

objections was proper and does not violate the letter or the spirit of the statute. Extending the 90-day limitation in this way is much more consistent with the intent of the Legislature than dismissing and re-filing the case or requiring a party to file a separate extraordinary writ to accomplish the dismissal.

**{¶23}** Appellant's first assignment of error is without merit.

**{¶24}** Appellant's second assignment of error states:

**{¶25}** "The Trial Court committed reversible error by finding that the minor child was [neglected] against the manifest weight of the evidence."

**{¶26}** Appellant argues the trial court's finding of neglect was against the manifest weight of the evidence because she "was constantly seeking help for her child. She was not putting him in harm's way. She did not refuse him treatment and she did not omit care that caused him harm." Appellee responds that the finding of neglect was supported by the manifest weight of the evidence because the only issue was appellant's response to H.C.'s "imminent mental health concerns on April 29, 2014."

> 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [trier of fact] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶12, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990) (emphasis deleted).

**{¶27}** When reviewing a manifest weight challenge, the reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of

10

the witnesses to determine whether, "in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [verdict] must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the [verdict]." *Thompkins, supra*, 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶28} The trial court must find a child is neglected, pursuant to R.C. 2151.35(A), by clear and convincing evidence, which is a degree of proof that is more than a mere "preponderance of the evidence" but less than "beyond a reasonable doubt"; it is an amount of proof that "will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. In its judgment entry, the trial court found, by clear and convincing evidence, that H.C. was "neglected" under the following sections of R.C. 2151.03(A):

> (3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being;

> (4) Whose parents, guardian, or custodian neglects the child or refuses to provide the special care made necessary by the child's mental condition;

> (6) Who, because of the omission of the child's parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare[.]

{¶29} Evidence in the record reveals that on April 29, 2014, while H.C. was in school, all of the following occurred: a suicide note was discovered; H.C. was observed in his classroom with his head down; after H.C. left the classroom, he was found cutting

11

his wrists with a paper clip; H.C. admitted to writing the suicide note; and H.C. scored "significantly higher" than the baseline score on a suicide risk screening assessment administered by the school counselor, Mr. Goshe. Mr. Goshe called appellant twice, explained to her the details of the situation, and stated H.C. needed to be picked up from the school and required further evaluation by a mental health professional. Mr. Goshe testified that appellant responded she was not going to pick up H.C. from school, and she would not permit any of H.C.'s other emergency contacts to pick him up. Appellant, instead, repeatedly instructed Mr. Goshe to "call the State." After unsuccessfully attempting to contact H.C.'s step-father, Mr. Goshe eventually contacted PCDJFS.

{¶30} Kent Police responded to the school. Officer Carnahan testified that H.C. told him he wanted to kill himself; he cut his wrists the night before; he cut his wrists with a paper clip that day; and he wrote the suicide note. Officer Carnahan attempted to contact appellant three times at work and three times on her cell phone; appellant did not respond. Another officer made contact with appellant at work, after explaining to appellant's co-worker that it was an emergency, and appellant insisted on speaking with a police supervisor. Appellant again refused to address H.C.'s immediate mental health concerns, and Officer Carnahan ordered H.C.'s removal.

{¶31} Ms. Sharar, a social worker with PCDJFS, arrived at the school, and H.C. expressed to her that he wanted to kill himself. Ms. Sharar contacted appellant, who stated, "It's not that big of a deal," and threatened to sue Ms. Sharar and PCDJFS. H.C. was then transported to Coleman Professional Services and, ultimately, to Belmont Pines.

{¶32} Based on these specific facts and all of the evidence presented at the adjudicatory hearing, we find the juvenile court did not err in finding clear and convincing evidence that H.C. is neglected as defined in R.C. 2151.03(A)(3), (4), and (6). There is nothing to suggest that any of the evidence is legally insufficient to support the court's judgment or that its judgment is based on an irrational view of the evidence. Also, there is nothing to suggest that the trier of fact clearly lost its way and created a manifest miscarriage of justice in adjudicating H.C. neglected.

{¶33} Appellant's second assignment of error is without merit.

{¶34} Appellant's third assignment of error states:

{¶35} "The Trial Court committed reversible error by not following statute when it came to the reasonable efforts' findings."

{¶36} Appellant asserts the trial court did not comply with R.C. 2151.419(B)(1), in that it did not "make specific findings regarding how the agency fulfilled [its] duty to perform reasonable efforts." We agree.

{¶37} R.C. 2151.419(A)(1) provides, in pertinent part:

> [A]t any hearing held pursuant to section * * * 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts [1] to prevent the removal of the child from the child's home, [2] to eliminate the continued removal of the child from the child's home, or [3] to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts.

{¶38} R.C. 2151.419(B)(1) provides:

13

A court that is required to make a determination as described in division (A)(1) * * * of this section shall issue written findings of fact setting forth the reasons supporting its determination. If the court makes a written determination under division (A)(1) of this section, it shall briefly describe in the findings of fact the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from the child's home or enable the child to return safely home.

{¶39} It is apparent from a reading of the statute that the findings required of the trial court need to relate, at a minimum, to the relevant services provided to prevent the child's initial removal from the home and the relevant services provided to enable reunification. The Twelfth Appellate District has provided an explanation of this requirement:

In situations where a child services agency did not have prior contact with a child but removes the child from his home during an emergency in which the child could not safely remain in the home, a trial court may determine that the agency made reasonable efforts to prevent the removal from the home or to enable the child to return safely home. R.C. 2151.419(A)(1). The child's health and safety are paramount considerations in making such a determination. *Id.* '[T]he issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute.'

*In re J.M.*, 12th Dist. Clermont No. CA2006-11-096, 2007-Ohio-4219, ¶16, quoting *In re K.M.*, Butler App. No. CA2004-02-052, 2004-Ohio-4152, ¶23.

{¶40} We note that appellant raised this same issue in her supplemental objections to the magistrate's decision. In its adjudicatory order, the magistrate found that reasonable efforts were made to prevent H.C.'s removal, to eliminate his continued removal, or to make it possible for H.C. to return home. No further explanation was provided. In ruling on appellant's objections, the trial court did not elaborate on the magistrate's findings of fact in this regard.

14

**{¶41}** The trial court found that "because of the exigent circumstances of the mental health crisis that [H.C.] had on April 29, 2014 and his mother's failure to cooperate to find appropriate treatment for her son that law enforcement officials had no choice but to involuntarily civil commit H.C. to a mental health institution." The trial court further stated, more generally, that "[t]he Agency made reasonable efforts to seek cooperation from the child's mother but she did not cooperate with law enforcement, school officials, and/or [PCDJFS]."

**{¶42}** Appellee first argues that the "statute merely *advises* that a juvenile court issue written findings." This contention is inaccurate. The statute clearly *requires* that explicit findings be made by the trial court. *See, e.g.*, *In re J.G.*, 9th Dist. Wayne No. 12CA0037, 2013-Ohio-417, ¶33-34; *In re Litz*, 11th Dist. Geauga No. 2001-G-2367, 2001 Ohio App. LEXIS 5061, *15-16 (Nov. 5, 2001). Ohio law clearly requires these findings to be made, and a "trial court's failure to identify in its decision the specific efforts expended by Children's Services" to prevent the child's removal or to enable reunification is prejudicial error. *J.M.*, *supra*, ¶19, citing R.C. 2151.419(B)(1) and *In re Bolser*, Butler App. Nos. CA99-02-038 & CA99-03-048, 2000 Ohio App. LEXIS 260, *20-21 (Jan. 31, 2000).

**{¶43}** Next, appellee argues that, even if it is a requirement, the trial court did make sufficient written findings in its judgment entry. In support, appellee cites to a decision from this court: *In re Graves*, 11th Dist. Geauga No. 99-G-2219, 2000 Ohio App. LEXIS 2762 (June 23, 2000). This case is inapposite. In *Graves*, the child was the victim of repeated sexual abuse in the home. *Id.* The record was replete with reasons as to why the child could not be returned to the home. Although the trial court's

15

judgment entry lacked findings in support of its determination that reasonable efforts were made, we found "other indications in the record which amply demonstrate that the juvenile court engaged in the required reasonable efforts determination." *Id.* at *39. This court held that, "[o]n the whole, therefore, the record manifestly supports the conclusion that the juvenile court satisfied its duty under R.C. 2151.419 to engage in the reasonable efforts determination * * *." *Id.* at *40.

{¶44} The record in this case does not amply demonstrate that the juvenile court engaged in the required reasonable efforts determination, and appellee does not direct our attention to anything in the record that supports its argument. The trial court did make explicit findings regarding reasonable efforts taken to prevent H.C.'s initial removal: e.g., attempting "on many occasions to contact" appellant and that appellant "did not cooperate with law enforcement, school officials, and/or the [PCDJFS]." However, this court is unable to determine from the record whether these findings also apply to any attempt to return H.C. to his home, and no other findings are provided with regard to reunification attempts. In short, there is no evidence—in the judgment entry or in the record—to support the trial court's finding that efforts were made regarding reunification or that any efforts made were reasonable.

{¶45} The dissent asserts that this holding "overlooks the fact that this case was at the initial adjudicatory stage." We have not overlooked this fact. The requirements of R.C. 2151.419(A)(1) explicitly apply to adjudicatory hearings: "[A]t any hearing held pursuant to section 2151.28 * * * at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall" make

16

the above-referenced findings. R.C. 2151.28 is titled "Adjudicatory hearing; shelter care determination; summons." It states, in pertinent part:

> At an adjudicatory hearing held pursuant to division (A)(2) of this section, the court, in addition to determining whether the child is an abused, neglected, or dependent child, shall determine whether the child should remain or be placed in shelter care until the dispositional hearing. When the court makes the shelter care determination, all of the following apply: * * * (2) *The court shall comply with section 2151.419 of the Revised Code.*

R.C. 2151.28(B) (emphasis added). We also note that the adjudicatory hearing was held on June 26, 2014—fifty-seven days after the complaint was filed on April 30, 2014. One would hope that some reasonable effort had taken place to determine whether the child could return safely home within that time. There is simply no evidence in the record of any efforts made.

{¶46} Appellant's third assignment of error is well taken.

{¶47} The judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed in part and reversed in part; this case is remanded for the trial court to make factual findings as required by R.C. 2151.419(B)(1).


COLLEEN MARY O'TOOLE, J., concurs,

DIANE V. GRENDELL, J., dissents in part with a Dissenting Opinion.

_____

DIANE V. GRENDELL, J., dissents in part with a Dissenting Opinion.

17

{¶48} I agree with the majority's conclusions that the juvenile court had jurisdiction to issue a dispositional order and that its order was not against the manifest weight of the evidence.

{¶49} I dissent from the majority's decision to reverse and remand this case on the grounds that the court failed to comply with R.C. 2151.419. The court did issue "written findings of fact setting forth the reasons supporting its determination" that Portage County Job and Family Services "made reasonable efforts to prevent the removal of [H.C.] from [H.C.'s] home." R.C. 2151.419(B)(1) and (A)(1).

{¶50} As acknowledged by the majority, the juvenile court expressly found that reasonable efforts were made to prevent H.C.'s removal. Specifically, "[t]he Agency made reasonable efforts to seek cooperation from the child's mother but she did not cooperate with law enforcement, school officials, and/or the Portage County Department of Job and Family Services." More specifically, the court found "that [H.C.'s] Kent school counselors, the Kent Law Enforcement Officials, and the Portage County Department of Job and Family Services attempted on many occasions to contact [H.C.'s] mother," but "were informed that she was not coming to get her son and that the school counselors should contact the State of Ohio." Bearing in mind that H.C. was threatening and attempting to commit suicide, repeated appeals to his mother that she seek psychiatric care for her son certainly constitute reasonable efforts.

{¶51} Incredibly, the majority feels compelled to reverse on the grounds that "this court is unable to determine from the record whether these findings also apply to any attempt to return H.C. to his home, and no other findings are provided with regard to reunification attempts." *Supra* at ¶ 44. The majority overlooks the fact that this case

18

was at the initial adjudicatory stage. The judgment appealed merely adjudicates H.C. as neglected and awards Job and Family Services interim pre-dispositional custody – it does not prolong or extend Job and Family Services' custody of a child already removed. Due to continuances, the adjudicatory hearing was held fifty-seven days after the complaint was filed on April 30, 2014 (the day following H.C.'s removal). Nevertheless, the issue before the juvenile court was whether H.C. was a dependent or neglected child at the time of his removal, not whether Job and Family Services had made reasonable efforts to reunify H.C. with his mother after his removal.[1]

{¶52} The majority is correct that R.C. 2151.419(A)(1)'s requirement that the "reasonable efforts [be made] to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home" applies to adjudicatory hearings. In fact, this requirement equally applies to probable cause hearings (R.C. 2151.31), detention and shelter care hearings (R.C. 2151.314), temporary emergency care hearings (R.C. 2151.33), as well as dispositional hearings (R.C. 2151.353). There is no requirement, however, that R.C. 2151.419(A)(1) be applied mechanically and without regard for the particular facts, issues, and procedural posture of a given case, as demanded by the majority. The issue of reunification does not become operative until the issue of removal is settled. It would be as nonsensical to require the juvenile court to make findings regarding reunification efforts at a shelter care hearing as it is in the present case.

---

1. That inquiry was certainly relevant at the subsequent dispositional hearing, which, on account of the delay in holding the initial adjudicatory hearing, was itself continued.

19

**{¶53}** Here, the juvenile court made express findings relevant to Job and Family Services' efforts to prevent the removal of H.C. Without question Job and Family Services has the obligation to make reasonable efforts to determine whether H.C. may safely return home, and such evidence should be presented at the appropriate stage of these proceedings.

**{¶54}** For legal support, the majority relies on *In re J.M.*, 12th Dist. Clermont No. CA2006-11-096, 2007-Ohio-4219. A fair application of the law in *J.M.* to the facts of this case demonstrates that the juvenile court satisfied its statutory duty with respect to the reasonable efforts determination. The court in *J.M.* stated that "the law requires the court to briefly describe the relevant services provided by the agency and why they were not effective in restoring [the child] to his home." *Id.* at ¶ 20.

**{¶55}** That is precisely what the juvenile court did in the present case. A suicidal H.C. required immediate psychiatric care. Portage Job and Family Services, as well as law enforcement and school officials, made repeated appeals to H.C.'s mother to seek the appropriate care. She refused. There was nothing more that could be done. This is explicitly set forth by the juvenile court in its order. In contrast, the lower court in *J.M.* "fail[ed] to identify in its decision the specific efforts expended by Children's Services to prevent [the child's] removal." *Id.* at ¶ 19.

**{¶56}** Unless it contemplates a new adjudicatory hearing, the majority is essentially remanding this case for the juvenile court to rewrite its judgment to state more explicitly what it has already explicitly stated. Accordingly, I respectfully dissent from the decision to reverse and remand.