[Cite as *In re K.R.*, 2021-Ohio-495.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: K.R.

C.A. No. 29815

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No. DN 20-01-075

DECISION AND JOURNAL ENTRY

Dated: February 24, 2021

CARR, Judge.

{¶1} Appellant Mother appeals from the judgment of the Summit County Court of Common Pleas, Juvenile Division, that adjudicated her child dependent and placed him in the temporary custody of appellee Summit County Children Services Board ("CSB" or "the agency"). This Court affirms.

I.

{¶2} Mother is the biological mother of K.R. (d.o.b. 7/28/18) and K.T. (deceased). Paternity for K.R. has been established, but Father has not participated in this appeal.

{¶3} When K.R. was 15 months old, he was taken into protective custody pursuant to Juv.R. 6 based on the suspicious death of his five-month-old sister, K.T. On January 28, 2020, CSB filed a complaint[1] alleging that K.R. was a dependent child because his environment

---

[1] CSB filed its original complaint in November 2019, but it dismissed that complaint based on statutory time limitations. The January 28, 2020 complaint was the agency's first refiled complaint.

warranted the State in assuming his guardianship. Specifically, the agency alleged that K.T. had died while in bed with Mother and K.R. The infant had been bleeding from the nose and a CT scan indicated the presence of a subdural hemorrhage. Mother had earlier been participating in voluntary case plan services with CSB based on Mother's use of marijuana during her pregnancy; serious mental health issues, including untreated depression and suicidal ideations; and Mother's attempts at physically harming herself and asking others to harm her in ways that would end her pregnancy with K.T. After K.T. was born at 32 weeks' gestation, the agency received a neglect referral concerning K.T. Although K.R. did not present with any injuries when he was removed after K.T.'s death, the agency also alleged that Mother had parenting issues, in that she would allow K.R. to play with bottles of medication and would leave the child unrestrained in highchairs.

{¶4} At the shelter care hearing, Mother and Father stipulated, through counsel, that there was probable cause for K.R.'s removal and that CSB had used reasonable efforts to prevent the child's removal from his home. Father was granted visitation as the parties might agree, while Mother was limited to two hours per week of supervised visitation at the agency center.

{¶5} Due to illness of the magistrate assigned to the case, the adjudication was scheduled for April 8, 2020, with the disposition to follow on April 20, 2020. The magistrate's order further stated: "All deadlines for adjudication have been waived until June [2020]. However, if all agree then the proceeding can be conducted by teleconference." Mother's attorney was copied on the order and did not move to set the order aside.

{¶6} At a status hearing attended by the parents' attorneys on the date scheduled for adjudication, the magistrate rescheduled the adjudication and disposition for June 12, 2020, and June 19, 2020, respectively, due to Covid-19 restrictions. No party moved to set aside the order.

{¶7} The adjudicatory hearing took place as scheduled in June. The assistant prosecutor, Mother's attorney, and Father's attorney all agreed without objection that the trial court would accept the Medical Examiner's Report of Autopsy regarding K.T. ("autopsy report") as an exhibit. In consideration of the testimony and exhibits admitted at the hearing, the magistrate found clear and convincing evidence of K.R.'s dependency. Specifically, the magistrate found that the condition or environment adversely affecting K.R. and warranting the State in assuming his guardianship included (1) the dangers posed by Mother's co-sleeping with her young children, and (2) the unexplained origin of K.T.'s skull fracture. After the dispositional hearing, the magistrate issued a decision adopting the agency's case plan, finding that CSB had made reasonable efforts to prevent the child's continued removal from home, and placing K.R. in the agency's temporary custody. Mother filed timely objections to both the adjudicatory and dispositional decisions of the magistrate.

{¶8} In challenging the adjudication, Mother argued the improper admission of evidence, including inadmissible hearsay testimony by the agency caseworker and a police detective, as well as the improper consideration of the autopsy report; the lack of clear and convincing evidence to support the dependency finding; and the lack of a reasonable efforts finding by the magistrate, as well as the lack of evidence to support any such finding. Although Mother also objected to the dispositional decision, challenging solely the adoption of the agency's case plan and the magistrate's reasonable efforts finding, Mother subsequently withdrew those objections.

{¶9} Upon consideration of Mother's supplemental objections to the adjudicatory decision and CSB's response thereto, the juvenile court sustained Mother's objections in part, and overruled them in part. Specifically, the juvenile court agreed that (1) the agency caseworker's

testimony regarding the substance of unauthenticated agency records, and (2) both the caseworker's and police officer's testimonies regarding the contents of the autopsy report were inadmissible hearsay. In addition, the juvenile court agreed that the magistrate erred in failing to make a reasonable efforts finding at adjudication. Nevertheless, because the judge found that the evidence supported a reasonable efforts finding, she made such a finding in her judgment. In overruling Mother's remaining objections, the juvenile court found that the autopsy report was properly admitted based on Mother's broad stipulations that the medical examiner was qualified as an expert and that the autopsy report should be admitted as a thorough report, the results of which speak for themselves. Moreover, the judge noted that Mother's attorney had cited repeatedly to the autopsy report during his closing argument. Finally, the juvenile court found clear and convincing evidence to adjudicate K.R. a dependent child.

{¶10} Mother filed a timely appeal. She raises four assignments of error for review. This Court rearranges the assignments of error to facilitate review.

II.

### ASSIGNMENT OF ERROR IV

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN NOT DISMISSING [CSB'S] COMPLAINT BECAUSE THE DISPOSITION WAS NOT COMPLETED WITHIN 90 DAYS OF THE DATE OF THE COMPLAINT.

{¶11} Mother argues that the juvenile court erred by failing to dismiss the agency's complaint when the dispositional hearing was not held within the statutorily required 90-day period following the filing of the complaint. This Court disagrees.

{¶12} At the time relevant to this matter, both R.C. 2151.35(B)(1)[2] and Juv.R. 34(A) required the juvenile court to dismiss the agency's complaint alleging dependency, neglect, and/or abuse without prejudice if the initial dispositional hearing was not held within 90 days after the date the complaint was filed. The Ohio Supreme Court relied on the plain language of both provisions to hold that

> R.C. 2151.35(B)(1) imposes a mandatory deadline requiring a juvenile court to dismiss a case without prejudice if the court fails to conduct a dispositional hearing within 90 days of the filing of a complaint alleging that a child is abused, neglected or dependent. And our holding applies with equal force to Juv.R. 34(A), which contains language essentially identical to that in R.C. 2151.35(B)(1).

*In re K.M.*, 159 Ohio St.3d 544, 2020-Ohio-995, ¶ 31. Moreover, the high court reasoned that "[i]f the General Assembly had intended for a juvenile court to proceed with dispositional determinations beyond the 90-day time limit in R.C. 2151.35(B)(1), it could have added language to that effect[ ] * * * [as it has] in other instances * * *[.]" *Id.* at ¶ 24. Accordingly, in the absence of additional legislative directives regarding the time limit in which a juvenile court must hold a dispositional hearing, this Court would be compelled to sustain Mother's fourth assignment of error. The Ohio legislature, however, enacted legislation extending the statutory time limit during the period relevant to this matter.

{¶13} Am. Sub. H.B. 197, approved and effective March 27, 2020, and made retroactive to March 9, 2020, was enacted pursuant to Article II, Section 1d, of the Ohio Constitution, as "an emergency measure necessary for the immediate preservation of the public peace, health, and safety" considering the Covid-19 pandemic. Section 40. Section 22. (A) of the Act tolled time for

---

[2] Sub. S.B. 256, approved on January 9, 2021, and effective April 12, 2021, amends R.C. 2151.35(B)(1) to allow the juvenile court under certain circumstances an additional 45 days beyond the current 90-day limit in which to hold the dispositional hearing before the complaint must be dismissed without prejudice.

a broad range of enumerated proceedings and deadlines which were otherwise "set to expire between March 9, 2020, and July 30, 2020[.]" Relevant to this case are subsection (4) which identifies "[t]ime deadlines and other schedule requirements regarding a juvenile, including detaining a juvenile;" and/or subsection (10) which relates to "[a]ny other criminal, civil, or administrative time limitation under the Revised Code." Accordingly, the 90-day time limit in R.C. 2151.35(B)(1) was tolled pursuant to the Act.

{¶14} Am. Sub. H.B. 197 only applies to toll statutory time limits. Therefore, on March 27, 2020, the Ohio Supreme Court issued a tolling order designed to work in tandem with Am. Sub. H.B. 197. *See* 03/27/2020 Administrative Actions, 2020-Ohio-1166. The high court's order was applicable to all Supreme Court-promulgated rules, including the Ohio Rules of Juvenile Procedure. *Id*. at (B)(1)(f). The order tolled time limits enunciated in the various rules from March 9, 2020, to July 30, 2020.

{¶15} CSB filed its complaint alleging K.R. to be a dependent child on January 28, 2020. The 90-day time limit in which the juvenile court was required to hold the dispositional hearing would have expired on April 28, 2020. Because that expiration date fell within the time period tolled by Am. Sub. H.B. 197 and the Ohio Supreme Court's tolling order, 90 days had not yet elapsed from the date of the filing of the complaint until the dispositional hearing on June 19, 2020. Accordingly, the juvenile court was not required to dismiss the complaint pursuant to either R.C. 2151.35(B)(1) or Juv.R. 34(A). Mother's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN CONSIDERING IN ITS ADJUDICATORY RULING AN AUTOPSY REPORT WHEN THE REPORT DID NOT STATE A CAUSATION OF INJURY OR DEATH IN TERMS OF PROBABILITY.

{¶16}   Mother argues that the juvenile court improperly considered the autopsy report regarding K.T. when determining whether K.R. was a dependent child.  This Court disagrees.

{¶17}   Mother does not argue that the juvenile court erred by admitting the autopsy report. In fact, she admits, and the record verifies, that Mother's attorney[3] stipulated to the admissibility of the report as an exhibit.  More specifically, Mother's attorney, after admitting he had had extensive discussions with the assistant prosecutor, stipulated that the Chief Medical Examiner for Summit County, who performed K.T.'s autopsy and prepared the report, is a licensed and properly credentialed physician in the state of Ohio, as well as an expert in the field of pathology and medical examination.  Mother's attorney further stipulated that the medical examiner produced a thorough report, that the exhibit was a true and accurate copy of the autopsy report, and that the opinions and results contained in the report speak for themselves.  Asserting his belief that the medical examiner could neither add nor subtract from the substance of her report, Mother's attorney agreed that admission of the autopsy report supplanted the need for the medical examiner's testimony.

{¶18}   On appeal, Mother argues solely that the juvenile court erred in considering the autopsy report that he agreed was properly admitted.  By admitting that the autopsy report was admissible, Mother necessarily concedes that it was relevant to the issue of K.R.'s dependency. *See* Evid.R. 401 and 402.  Her argument is that this properly admitted, relevant evidence is incompetent because it did not state the cause of K.T.'s death within a reasonable degree of medical certainty.  This Court is not persuaded by Mother's argument.

---

[3] Mother was represented by the same attorney in both the juvenile proceedings and on appeal.

{¶19} The autopsy report concerned K.T., a child living in the home with Mother and K.R. at the time of K.T.'s death. The report detailed the various examinations, including medical and social histories, performed by the chief medical examiner. Based on a full autopsy, the medical examiner issued findings, diagnoses, and her opinion as to both the cause and manner of K.T.'s death. Mother argues that the report is incompetent because it does not indicate that the opinion is rendered in terms of probability.

{¶20} Mother cites various medical and dental malpractice cases, a personal injury case, and a criminal case involving victims of sexual abuse for the proposition that a medical expert must render an opinion in terms of probability lest the opinion lack evidentiary competence. None of the cases cited by Mother are analogous to the situation in this case. In each case cited, the medical expert's testimony or report related to the person injured or victimized. In this case, however, the medical examiner's report relates to the sibling of the subject child. CSB did not allege that K.T. was an abused child and had no burden to prove that here. The agency's only allegation was that K.R. was a dependent child based on his condition or environment. Proof of abuse of a sibling is not a prerequisite to a finding of dependency regarding another child in the home.

{¶21} The issue in the instant case is whether K.R.'s condition or home environment was detrimental to his well-being, not what precisely caused his sister's death. The autopsy report was not admitted to establish that Mother abused K.T. to death, or that she accidentally or negligently caused the infant's death. Rather, it was admitted solely to prove that Mother's conduct provided a home environment for her children which negatively impacted K.R.'s well-being.

{¶22} The autopsy report does not set forth a definitive cause or manner of K.T.'s death. In fact, both the cause and manner were "[u]ndetermined[.]" Mother argues that these opinions

are incompetent because they were not stated in terms of probability. It is unclear how an indeterminate conclusion might be expressed in terms of probability. Nevertheless, Mother does not challenge the competence of the information forming the bases for these opinions. In fact, Mother stipulated that the substance of the report spoke for itself. Accordingly, information relating, for example, to Mother's co-sleeping in a small bed with K.R. and K.T. when K.T. became unresponsive, the existence of K.T.'s skull fracture when no prior medical records indicated such an injury, and Mother's admission that she tried to terminate her pregnancy with K.T. by harming herself, would not have been subject to assertion in terms of probability relating to a reasonable degree of medical certainty.

{¶23} Mother attenuates the issue further by arguing that CSB had the burden of proving within a reasonable degree of medical certainty that K.R.'s environment was negatively impacted by his sister's death. Stated another way, Mother argues that K.R. cannot be adjudicated a dependent child unless the agency proves within a reasonable degree of medical certainty that the circumstances of K.T.'s death proximately caused K.R.'s condition or environment to warrant the State in assuming K.R.'s guardianship. There is no authority for such a proposition. A child's condition or environment within the context of an allegation of dependency pursuant to R.C. 2151.04(C) is not a matter outside of common knowledge or experience which necessitates expert testimony or evidence. *See* Evid.R. 702(A).

{¶24} Mother stipulated to the admissibility of the autopsy report regarding K.T. Both the cause and manner of that child's death were ruled undetermined by the chief medical examiner. The autopsy was not admitted for purposes of proving that K.T. was an abused child. CSB sought to admit the report solely to provide evidence of the home environment in which K.R. lived with Mother. There is no dispute that K.T. died while in Mother's care and while K.R. was also in the

home. Expert testimony and/or reports are not required to establish that a child's environment has a negative impact on the child's well-being. It is immaterial here whether K.T. was abused. At some point during her short life, she suffered injuries which led to her death. Mother was the infant's primary caregiver, and the baby died while in Mother's care. It is that environment which is the critical inquiry in this case to determine whether K.R. was a dependent child, not the precise cause of K.T.'s death. The autopsy report was relevant evidence relating to K.R.'s environment. Such evidence need not be presented in terms of reasonable degree of medical certainty. Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

> THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FOUND THE CHILD TO BE A DEPENDENT CHILD PURSUANT TO R.C. 2151.04(C), AS THAT FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶25} Mother argues that the juvenile court's finding that K.R. is a dependent child is against the manifest weight of the evidence. This Court disagrees.[4]

{¶26} Juvenile abuse, neglect, and dependency cases are initiated by the filing of a complaint. *See* Juv.R. 22(A); Juv.R. 10; R.C. 2151.27(A). The complaint is "the legal document that sets forth the allegations that form the basis for juvenile court jurisdiction." Juv.R. 2(F). The juvenile court must base its adjudication on the evidence adduced at the adjudicatory hearing to support the allegations in the complaint. *See In re Hunt*, 46 Ohio St.2d 378, 380 (1976). If allegations in the complaint are not proved by clear and convincing evidence at the adjudicatory hearing, the juvenile court must dismiss the complaint. Juv.R. 29(F)(1); R.C. 2151.35(A)(1). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm

---

[4] In reaching our conclusion, this Court has not considered any evidence excluded by the juvenile court.

belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶27} This Court reviews as follows:

> In determining whether the juvenile court's adjudication of dependency is against the manifest weight of the evidence, this court [reviews] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed[.]

(Alterations sic.) *In re R.L.*, 9th Dist. Summit No. 28387, 2017-Ohio-4271, ¶ 8, quoting *In re C.S.*, 9th Dist. Summit No. 26178, 2012-Ohio-2884, ¶ 5, quoting *In re A.W.*, 195 Ohio App.3d 379, 2011-Ohio-4490, ¶ 8 (9th Dist.).

{¶28} Mother challenges the finding that K.R. is dependent pursuant to R.C. 2151.04(C) which defines "dependent child" as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" This Court recognizes that

> [a] dependency finding under R.C. 2151.04(C) does not require specific parental fault; rather the focus is on the child's situation to determine whether the child is without proper or adequate care or support. The conduct of the parent is relevant only insofar as it forms a part of the child[ ]'s environment and it is significant only if it has a detrimental impact on [him].

(Internal citations and quotations omitted.) *In re A.S.*, 9th Dist. Summit No. 29472, 2020-Ohio-1356, ¶ 10, quoting *In re I.T.*, 9th Dist. Summit Nos. 27513, 27560, and 27581, 2016-Ohio-555, ¶ 32. Moreover, we have held that "a parent's mental health is directly related to a child's environment and may properly be considered in determining whether state intervention is thereby warranted." *In re I.T.* at ¶ 32, citing *In re J.C.*, 9th Dist. Summit Nos. 26229 and 26233, 2012-Ohio-3144, ¶ 21.

{¶29} The agency did not allege, and no evidence was presented to show, that K.R. had suffered any physical injuries while in Mother's care. The child was not malnourished, was of the appropriate weight and height for his age, had no bruises, and did not exhibit any physical or mental health issues. The home he shared with Mother and K.T. belonged to another adult couple who were friends of Mother. There were no physical safety hazards identified in that home. The CSB intake worker admitted that the agency based its dependency allegation regarding K.R. solely on the circumstances surrounding K.T.'s death.

{¶30} The intake worker testified that Mother said she brought the fussy K.T. to bed with her and K.R. Shortly thereafter, Mother felt something wet on her shirt. When she turned on the light, she saw blood. K.T. was unresponsive. Because her phone was off, Mother ran to a neighbor's home. The neighbor called for emergency services. It is unclear why Mother did not seek assistance from the two adults in the home where she was living, as the record indicates they were home at the time.

{¶31} The intake worker discussed with Mother both her prior involvement with CSB and her mental health. Mother acknowledged the prior safety plan which required her to move in with friends who could help watch her children and meet their needs. Although the safety plan had been discontinued prior to K.T.'s death, Mother and the children had remained in the same home with friends. Mother also admitted to the intake worker that she had mental health issues which she was addressing with a mental health services provider.

{¶32} A detective with the Akron Police Department, Juvenile Unit, responded to a call regarding a baby in distress at the address where Mother was living. Neither Mother nor K.T. were at the home, but the detective was able to see that K.R. was safe in the home with Mother's

friends. The detective observed the bedroom where Mother had been sleeping with the children. He observed blood on the pillow and bedding in the room.

{¶33} Upon learning that Mother and K.T. were at Akron Children's Hospital, the detective went to the hospital to interview Mother. He saw blood on Mother's shirt. Mother told him that K.R. was sleeping in bed with her and K.T. when Mother thought the baby had spat up on her. When Mother saw blood coming from K.T.'s nose, she panicked. As she could not find her phone, Mother ran to the neighbor's home with K.T. After seeing blood, the neighbor called 911. Mother was distraught, but cooperative, while speaking with the detective and claimed not to know what happened to the infant.

{¶34} The detective attended the autopsy for K.T. Although he had no independent knowledge about the cause or age of peculiar marks on the infant's skull, the detective observed those marks.

{¶35} The autopsy report indicated that K.T.'s cause of death was undetermined, as there was evidence of both head trauma and possible asphyxia. The autopsy report also indicated that the manner of K.T.'s death was undetermined, based on concerns regarding the infant's unreported skull fracture and accidental asphyxiation due to co-sleeping. The medical examiner could also not rule out intentional smothering of the child. The report noted Mother's history wherein she acknowledged having made statements about self-injury with the intent to terminate her pregnancy with K.T. The autopsy report indicated there was no evidence of acute infection, acute injury, or organic issues that would have caused the infant's death. The medical examiner's chief concerns were for the unsafe sleeping conditions and unexplained head injury, as either or both may have contributed to K.T.'s death.

{¶36} Based on a review of the evidence, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice by adjudicating K.R. a dependent child. The clear and convincing evidence supports the finding that K.R.'s environment created a substantial risk to his well-being. Mother admitted to both the agency intake worker and the police detective that both K.T. and K.R. were sleeping in bed with her when K.T. began bleeding and became unresponsive. The detective saw blood on the pillow and bedding where Mother had been sleeping with the children, as well as on Mother's shirt at the hospital. Mother was engaged in a prior safety plan with CSB based on concerns for the children's needs. The autopsy report supports the reasonable inference that the home environment, wherein K.T. suffered either intentional or accidental head trauma; where no medical care was sought for the infant's skull fracture; where Mother engaged in co-sleeping practices with her children which put them at risk for asphyxiation; where Mother was dealing with unresolved mental health issues; where Mother had engaged in self-harm in an attempt to end a pregnancy; and where a sibling ultimately died as a result of unexplained circumstances, warranted the state in assuming K.R.'s guardianship in the child's interest. Accordingly, the juvenile court's judgment adjudicating K.R. a dependent child is not against the manifest weight of the evidence. Mother's second assignment of error is overruled.

**ASSIGNMENT OF ERROR III**

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FINDING THAT [CSB] MADE REASONABLE EFFORTS AT THE ADJUDICATORY HEARING.

{¶37} Mother argues that the juvenile court erred by finding that CSB had made reasonable efforts to prevent the child's continued removal from his home at the time of the

adjudicatory hearing. In addition, she argues that the juvenile court failed to explain why the services provided by the agency failed to allow K.R. to safely return home. This Court disagrees.

{¶38} R.C. 2151.419(A)(1) requires the juvenile court to determine, at most hearings including adjudication, whether the agency made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." In explaining what satisfies reasonable efforts by the agency, this Court has stated:

> Although [Revised Code] Chapter 2151 does not define "reasonable efforts," courts construe the term to mean "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed[.]'" *In re T.B.-W.*, 9th Dist. Summit No. 27544, 2015-Ohio-992, ¶ 15, quoting *In re C.F.*, 113 Ohio St.3d 73, 2017-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 21, citing *In re Myers*, 4th Dist. Athens No. 02CA50, 2003-Ohio-2776, ¶ 18.

*In re K.C.*, 9th Dist. Lorain No. 17CA011135, 2017-Ohio-8779, ¶ 24. *See also In re Fast*, 9th Dist. Summit No. 15282, 1992 WL 64187, *3 (Mar. 25, 1992) (explaining that "reasonable efforts" does not require "all available efforts").

{¶39} A review of the record indicates that CSB had made efforts to assist Mother and to prevent the child's continued removal from Mother by establishing a safety plan and a voluntary case plan, by holding at least two team decision meetings, by coordinating and supervising visits for Mother at the Family Interaction Center and Mother's friends' home, and by investigating to try to approve other family members for placement of the child. As such efforts were reasonably designed to remove the threat to the child to allow him to return home, the evidence supports the juvenile court's finding that CSB engaged in the statutorily required reasonable efforts.

{¶40} Moreover, this Court concludes that the judgment entry complies with the requirements of R.C. 2151.419. In addition to briefly describing the relevant services provided to the family by the agency, the judgment must also explain why the child could not be safely returned home notwithstanding those services. *In re R.P.*, 9th Dist. Summit No. 26836, 2013-Ohio-5728, ¶ 33, citing R.C. 2151.419(B)(1).

{¶41} As an initial matter, this Court recognizes Mother's argument within the context of the specific procedural posture of the case below, i.e., at the adjudicatory stage of the proceedings. The issue before the juvenile court was whether K.R. was a dependent child when he was removed from Mother's home. As noted by one jurist in a sister district, the adjudication of a child "does not prolong or extend [the agency's] custody of a child already removed." *In re H.C.*, 11th Dist. Portage No. 2014-P-0059, 2015-Ohio-3545, ¶51 (Grendell, J., dissenting). Accordingly, although R.C. 2151.419 applies at adjudicatory hearings, "[t]here is no requirement, however, that [the statute] be applied mechanically and without regard for the particular facts, issues, and procedural posture of a given case * * * [.] The issue of reunification does not become operative until the issue of removal is settled." *Id.* at ¶ 52.

{¶42} In this case, the judgment entry clearly enunciates the services referenced above. The court order further explained that Mother has a history of mental health issues and that the autopsy report referenced three suspicious conditions, any of which might have caused K.T.'s death. The judgment notes the medical examiner's concerns regarding K.T.'s unaddressed head injury, accidental asphyxia due to unsafe sleeping practices, and possible intentional smothering. In regard to these concerns, the juvenile court expressly found that "[K.R.'s] environment was unsafe." By refusing to "gamble" with the child's welfare, the juvenile court sufficiently explained why K.R. could not be returned to Mother's care despite the reasonable efforts implemented by

CSB.  Accordingly, the juvenile court adequately complied with the statutory requirements in R.C. 2151.419.  *See In re R.P.* at ¶ 34.  Mother's third assignment of error is overruled.

III.

{¶43}  Mother's assignments of error are overruled.  The judgment adjudicating K.R. a dependent child and placing him in the temporary custody of CSB is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

NEIL P. AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.