[Cite as *In re K.C.*, 2017-Ohio-8779.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: K.C.
    A.G.

C.A. No.    17CA011135

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE Nos.    15 JC 47069
               15 JC 47070

DECISION AND JOURNAL ENTRY

Dated: December 4, 2017

HENSAL, Presiding Judge.

{¶1} Appellant Mother appeals the judgment of the Lorain County Court of Common Pleas, Juvenile Division, that granted legal custody of her children K.C. and A.G. to Paternal Great Aunt and Uncle ("Aunt" and "Uncle"). For the following reasons, this Court affirms.

I.

{¶2} Mother is the biological mother of K.C. (d.o.b. 12/15/11) and A.G. (d.o.b. 8/22/15). Father is the biological father of A.G. Paternity was never established as to K.C.; and that child's alleged father did not participate in any proceedings, despite proper service. Aunt is the biological paternal great aunt of A.G. and an interested third party relevant to K.C. Uncle is an interested third party as to both children.

{¶3} In October 2015, Lorain County Children Services ("LCCS") received a referral alleging that the children were witnesses to domestic violence in the home between Mother and Father, that Mother was using heroin and other drugs, that a drug deal in the parents' home had

resulted in a hostage situation involving the children, that Mother was experiencing mental health issues, that the parents were recently evicted, and that Father had been incarcerated for failing to register as a sex offender. LCCS initiated a safety plan for the family wherein the children and Mother moved in with a paternal relative. A month later, LCCS filed a complaint alleging that the children were neglected and dependent. A few days later, Mother agreed to participate in the Lorain County Family Drug Court and participate in treatment at Lorain County Alcohol and Drug Abuse Services, Inc. ("LCADA") in an effort to address her substance abuse issues. Unfortunately, Mother terminated her services at LCADA, leaving her ineligible for further participation in the drug court.

{¶4} After contested hearings, K.C. and A.G. were adjudicated neglected and dependent and placed in the temporary custody of Aunt with an order of protective supervision to LCCS. The juvenile court adopted the agency's case plan as the order of the court. Mother's case plan objectives included significant substance abuse, domestic violence, and mental health components. In addition, Mother was required to obtain adequate and appropriate housing, demonstrate the ability to meet the children's basic needs, regularly visit with the children, and cooperate with the caseworker.

{¶5} Five months after the initial disposition, LCCS filed a final dispositive motion for legal custody to Aunt and Uncle and a termination of the agency's protective supervision. Aunt and Uncle both signed the requisite statement of understanding relevant to a third party's assumption of legal custody. A contested custody hearing took place before the magistrate almost a year after the agency filed its complaints in this case, and approximately six weeks after Mother relocated to Tennessee. During closing arguments, Mother requested a six-month extension of temporary custody. In her decision, the magistrate found that LCCS had used

reasonable efforts to prevent the continued removal of the children from their home. She awarded legal custody to Aunt and Uncle and terminated the agency's order of protective supervision. The juvenile court adopted the magistrate's decision and ordered that the children be placed in the legal custody of Aunt and Uncle and that the agency's protective supervision be terminated.

{¶6} Mother filed a timely objection, asserting only that the evidence did not support the magistrate's decision. She supplemented her argument with citations to the record after the transcript of the hearing was filed. LCCS responded in opposition to Mother's objection. After hearing oral arguments, the juvenile court overruled Mother's objection and adhered to its prior order awarding legal custody and terminating protective supervision. Mother filed a timely appeal in which she raises two assignments of error for review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT'S GRANT OF LEGAL CUSTODY TO [ ] AUNT AND UNCLE, WHICH ENCOMPASSED A FINDING THAT LEGAL CUSTODY WAS IN THE "BEST INTERESTS" OF THE CHILDREN AND THAT THE AGENCY EXPENDED "REASONABLE EFFORTS" TO REUNIFY THE CHILDREN WITH MOTHER, AND ITS CORRESPONDING DENIAL OF MOTHER'S REQUEST FOR A SIX-MONTH EXTENSION, CONSTITUTED AN ABUSE OF DISCRETION AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶7} Mother argues that the juvenile court's findings that LCCS used reasonable efforts to reunify the children with Mother and that an award of legal custody of K.C. and A.G. to Aunt and Uncle was in the best interest of the children were against the manifest weight of the evidence.

On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable,

persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶8} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶9} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enunciated in Revised Code Section 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17.

Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in Section 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976, 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in Section 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850, 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶10} K.C. and A.G. have adjusted well in their home with Aunt and Uncle. Initially, the then-4-year old K.C. was very angry when he was placed with his relatives. He threw tantrums and toys. He hit and kicked Aunt, and punched another child in the home. However, after counseling to address his violent behaviors, K.C. is no longer angry and has acclimated peacefully to his current home. The children share a close bond with each other, as well as with Aunt, Uncle, and an 8-year old cousin living in the home. K.C. has also adjusted well in school. He interacts appropriately with classmates, appears happy, and volunteers. He is on target with kindergarten readiness skills. Aunt and Uncle have addressed the child's chronic ear infections requiring removal of his adenoids, and his significant dental issues requiring eight root canals and a filling. A.G. has been assessed by Help Me Grow and is developmentally on target as well. She has no health issues.

{¶11} While Mother behaves appropriately during visitations with the children, and the three clearly love each other, Mother has attended fewer than half of the visitations to which she was entitled. After relocating to Tennessee, Mother engaged in video chats with the children at least weekly, although it is unclear how meaningful such visitation would have been to the one year old A.G.

{¶12} K.C. was not quite four years old, and A.G. was almost three months old, when they were removed from Mother's home. By the time of the hearing, the children had spent almost eleven months in Aunt's and Uncle's care. Given the young ages of the children, they were not competent to articulate a custodial preference. The guardian ad litem reported that it was in the best interest of the children to be placed in the legal custody of Aunt and Uncle based on her concerns, and Mother's admission to her, that Mother could not provide a home and support for the children.

{¶13} Although Mother argues that her case plan compliance indicates that she would be able to provide a safe and stable permanent environment for the children in the near future, a preponderance of the evidence demonstrates otherwise. Her case plan objectives included substance abuse, domestic violence, mental health, and basic needs components.

{¶14} Mother has a significant substance abuse history. She is a recovering heroin addict. Although she had not used heroin in five years, she had recently used other illegal substances despite participation in multiple substance abuse treatment programs. After leaving the program at LCADA, and thereby being terminated from Family Drug Court, Mother engaged in and successfully completed a drug treatment program at Psych and Psych in April 2016. Nevertheless, Mother tested positive for marijuana use in June 2016, and positive for both marijuana and cocaine use in both July and August 2016. She blamed her relapse on stressors in

her life and the fact that she is a recovering addict. Specifically, although she identified Father as a negative influence on her and a catalyst for her drug use, Mother explained that she used marijuana and cocaine even after she broke up with Father because the break up resulted in her having to leave the home the two shared, thereby leaving her homeless.

{¶15} When Mother moved to Tennessee, she entered an inpatient treatment facility, but left the six-month program after only ten days. Mother explained that she did not believe the program was helpful, because it was solely faith-based and would not allow her to communicate with anyone outside of "remedial family." Mother claimed to have then enrolled in an outpatient drug treatment program within days of leaving the inpatient facility. Mother testified that she last used illegal drugs a little over a month before the hearing. Accordingly, Mother either used drugs at the inpatient facility or in the short period of time between leaving the inpatient facility and enrolling in outpatient treatment. After many years of substance abuse, Mother had attained sobriety for just over a month at the time of the hearing. Although Mother's grandmother, with whom she lives in Tennessee, supports Mother's efforts for rehabilitation, the grandmother testified that she calls Mother's boss every day to verify that Mother actually went to work instead of someplace else to use drugs.

{¶16} The caseworker referred Mother to Genesis House for a domestic violence assessment. After submitting to the assessment, Mother began a 12-week domestic violence group treatment program. She attended two sessions and quit. Although the caseworker encouraged Mother to obtain a reassessment and return to treatment, Mother failed to do so. Mother blamed her domestic violence issues on Father's infidelity and their "toxic" relationship. Mother admitted punching Father in the face in the summer of 2016, but "[m]ore or less in like self-defense." At the time of the hearing, there was a domestic violence charge pending against

Mother arising out of another incident when she ran over Father's foot with her car in the fall of 2016.

{¶17} As for mental health services, Mother engaged sporadically in treatment with various providers, always leaving without successfully completing any programs. She engaged in couples' counseling with Father for two sessions, but stopped when she decided to leave Father. Although she claimed to have ceased all contact with Father, he testified that Mother continues to call him and just recently notified him that she was in town.

{¶18} Mother also participated in mental health treatment at Charak Center, where she was diagnosed with bipolar disorder and put on medication. Reasoning that because she had no need for medication before meeting Father, Mother stopped taking her prescribed medication and declared, "I don't have a mental health problem."

{¶19} Given the ongoing concerns for Mother's substance abuse, domestic violence, and mental health issues, LCCS focused less attention on Mother's ability to provide for the basic needs of the children. However, the caseworker noted that Mother lost her housing in Ohio, when she had to vacate the trailer she and Father had purchased together, after Father reported an incident of domestic violence to the police. At the time of the hearing, Mother was living in her aunt's four-bedroom home in Tennessee with at least five other people. Her grandmother testified that she planned to give Mother her home in Tennessee after a black mold problem in two bedrooms was eradicated. That home had been in the process of rehabilitation for six months, and Mother's grandmother estimated it would take at least another six months due to cost issues. Notwithstanding her grandmother's assertion that she would give Mother a mortgage-free home in Tennessee, Mother's future residency remains unclear. Mother testified

that she plans to finish her treatment in Tennessee and then reengage with her counselor at Psych and Psych, indicating an intention to return to Ohio. However, Mother had no housing in Ohio.

{¶20} Nor did Mother have any definitive employment prospects in Ohio. On the other hand, Mother found temporary part-time employment in Tennessee mowing grass. She recently obtained alternative part-time employment at a fast food restaurant. Based on the evidence, it remains unclear whether Mother intends to remain in Tennessee or return to Ohio.

{¶21} Based on a review of the evidence, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice in awarding legal custody of K.C. and A.G. to Aunt and Uncle. The evidence established that Mother had not addressed the issues, namely substance abuse, domestic violence, and mental health, that jeopardized the safety and stability of the children. Despite moving from one treatment program to another, Mother continued to use drugs, including marijuana and cocaine. She had only been sober for about a month at the time of the hearing. Moreover, Mother demeaned the seriousness of her issues. She blames others, in particular Father, for her relapses into substance abuse and her acts of domestic violence. In addition, she denies having any mental health issues, despite being diagnosed with bipolar disorder. Mother admitted that she was not ready to assume responsibility for the two children, and her lack of substantial progress on her case plan objectives indicates that she would not likely have resolved her issues within the term of a six-month extension of temporary custody.

{¶22} On the other hand, the children are thriving in Aunt's and Uncle's home, where all of their needs are being met. Aunt and Uncle have shown a dedication to the long term safety, care, and support of the children. They are agreeable to facilitating a relationship between the children and Mother and Father. Under the circumstances, the juvenile court's

finding that an award of legal custody to Aunt and Uncle was in the best interest of the children was not against the manifest weight of the evidence.

{¶23} Mother further argues that the juvenile court's finding that LCCS used reasonable efforts to facilitate reunification of the children with her was against the manifest weight of the evidence.

{¶24} Section 2151.419(A)(1) requires the agency to prove that it has made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." Moreover, "[i]n determining whether reasonable efforts were made, the child's health and safety shall be paramount." *Id.* Although Chapter 2151 does not define "reasonable efforts," courts construe the term to mean "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed[.]'" *In re T.B.-W.*, 9th Dist. Summit No. 27544, 2015-Ohio-992, ¶ 15, quoting *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 21, citing *In re Myers*, 4th Dist. Athens No. 02CA50, 2003-Ohio-2776, ¶ 18.

{¶25} Mother challenges the agency's use of reasonable efforts to reunify her with the children solely on the basis of the agency's failure to discuss Mother's treatment or prognosis with service providers since her move to Tennessee six weeks before the hearing. However, Mother decided without consultation with the caseworker to move to Tennessee to be with

family. The caseworker only learned a few weeks before the hearing after calling Mother for information that Mother had started outpatient substance abuse treatment services in Tennessee. Because Mother had only participated in outpatient treatment for three weeks of a twelve-week program at the time of the hearing, it is unclear how the caseworker's discussion with that treatment provider so early into treatment would have revealed any additional relevant information in this case. Moreover, as Mother had only remained in inpatient treatment after shortly arriving in Tennessee for 10 days (of a six-month program) before leaving that facility because she did not think the program was helpful, that service provider would have had no information relevant to the issue of the likelihood of reunification.

{¶26} On the other hand, the caseworker testified that throughout this case he (1) implemented multiple safety plans for the family prior to adjudication and disposition, (2) referred Mother to drug court, (3) referred Mother for various substance abuse programs, (4) referred Mother for mental health services, (5) facilitated and attended multiple family team meetings to discuss and implement case planning with the parties, and (6) conducted multiple home visits to observe the parents, the caregivers, and the children. The record indicates that Mother's lack of insight into her accountability and her failure to consistently take advantage of services, rather than a lack of reasonable efforts by the agency, prevented Mother's reunification with the children. Based on our review, we cannot conclude that the juvenile court's finding that LCCS made reasonable efforts to facilitate reunification of the children with Mother was against the manifest weight of the evidence. Mother's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN CONSIDERING THE GAL REPORT IN MAKING ITS DETERMINATION REGARDING THE BEST INTERESTS OF THE CHILDREN, AS THE GAL DID NOT COMPLY WITH HER DUTY UNDER THE LAW TO CONDUCT AN ADEQUATE INVESTIGATION PRIOR TO GIVING HER RECOMMENDATION TO THE COURT.

**{¶27}** Mother argues that the juvenile court erred in considering the report of the guardian ad litem in rendering its judgment, because the guardian did not conduct a dutiful investigation. Mother failed to preserve this issue for appeal by failing to object below. Although she filed an objection to the magistrate's decision, Mother limited her objections to challenging the weight of the evidence on the issues of reasonable efforts and the best interest of the children. She never moved to strike the guardian's report or otherwise objected to its consideration by the juvenile court.

**{¶28}** Juvenile Rule 40(D)(3)(b)(iv) provides:

> Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b).

Therefore, "[w]hen a party fails to raise an issue in the party's objections to the magistrate's decision, it may not be raised for the first time on appeal." *Varner v. Varner*, 9th Dist. Wayne No. 06CA0024, 2007-Ohio-675, ¶ 22. As Mother failed to challenge the performance of the guardian ad litem in her objection, she has forfeited the issue on appeal, except for a claim of plain error. *See* Juv.R. 40(D)(3)(b)(iv). Accordingly, Mother must demonstrate that it was plain error for the juvenile court to have considered the report of the guardian ad litem in determining the best interest of the children.

{¶29} To date, this Court has declined to determine whether the criminal or civil plain error standard is applicable to dependency, neglect, and abuse cases. *In re S.G.*, 9th Dist. Summit No. 27428, 2015-Ohio-2503, ¶ 11, citing *In re D.S.*, 9th Dist. Summit No. 24619, 2009-Ohio-3167, ¶ 10. Nor need we do so in this case, as Mother failed to show under either standard that the juvenile court committed plain error in considering the guardian's report.

> In the criminal context, plain error does not exist unless it can be said that but for the error, the outcome of the trial would have been different and that reversal is necessary to prevent a manifest miscarriage of justice. *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 57. The civil plain error standard may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself. *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.

(Internal quotations omitted.) *In re S.G.* at ¶ 11.

{¶30} The guardian ad litem visited the children at least monthly. She observed Mother's interaction with the children during visits, as well as the children's acclimation in the caregivers' home. She spoke with all parties, as well as the caseworker, to gather information. She testified that she focused her investigation on the children, rather than on the parents. In addition, the guardian ad litem explained that she had not had contact with Mother since she moved to Tennessee, because Mother never contacted her. Mother testified that she changed her phone number after moving to Tennessee to avoid calls from Father.

{¶31} As discussed above, the juvenile court heard evidence from multiple witnesses, including Mother herself, indicating concerns about Mother's ability to provide the children with a safe and stable environment. The LCCS caseworker expressed serious concerns about Mother's failure to address her long term substance abuse, mental health, and domestic violence issues, all of which would negatively affect her ability to provide necessary care for the children.

Mother admitted that, even though she completed a substance abuse treatment program at Psych and Psych, she continued to use illegal substances, including marijuana and cocaine as recently as a month before the hearing. Mother also admitted that she punched Father in the face and that there was a recent domestic violence charge pending against her for another incident with Father. She further dismissed her recent mental health diagnosis for bipolar disorder and refused to take her prescribed medication. Regarding all of these issues, Mother refused to accept any responsibility and blamed her substance abuse relapse, violent behavior, and alleged erroneous mental health diagnosis on Father and the stress and influence he brought into her life.

{¶32} As this Court concluded in an analogous case, "[e]ven if [Mother] could demonstrate that the investigation of the guardian ad litem was insufficient in this case, it was [Mother's] own behavior, not the opinion of the guardian ad litem, that convinced the trial court that [Mother] could not provide a suitable permanent placement for the children." *See In re K.T.*, 9th Dist. Summit Nos. 28411, 28424, and 28440, 2017-Ohio-2638, ¶ 42. Here, Mother has failed to demonstrate that the juvenile court's consideration of the report of the guardian ad litem was plain error. Mother's second assignment of error is overruled.

III.

{¶33} Mother's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JENNIFER HENSAL
FOR THE COURT

SCHAFER, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

ROBERT CABRERA, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and PREETHI KISHMAN, Assistant Prosecuting Attorney, for Appellee.

SHEILA DUFFEY, Guardian ad Litem.